ROYAL MINK RANCH v. RALSTON PURINA COMPANY

OPINION OF THE COURT

HOLBROOK, J.

1. SALES — WARRANTIES — BREACH — NEGLIGENCE — EVIDENCE — MINK RANCH — DEFECTIVE FEED.

Refusal to admit in evidence, in trial of action by mink ranch against manufacturer and seller of mink food for furnishing mink food deficient in vitamin A which caused disease in plaintiff's mink, the testimony of a witness pertaining to his observations at a mink ranch other than plaintiff's concerning ill effects suffered by mink there after eating food containing defendants' product *held*, proper because of irrelevancy where the food given the mink at plaintiff's ranch and at the ranch which was the subject of the testimony all contained defendants' product but was not otherwise the same, the cause of the injury to the other mink was not the same as the cause claimed by plaintiff, and the feed was not purchased from the same source.

2. ACTION—EVIDENCE—EXHIBITS—PRETRIAL CONFERENCE.

One of the purposes of a pretrial hearing is to make clear to counsel exactly what exhibits each side will introduce at the trial, and the pretrial order resulting from such conference should, unless cause is shown to the contrary, control the conduct of the trial, with the result that exhibits not listed in the pretrial order will not be admissible at trial (GCR 1963, 301.1[7]).

3. SALES—WARRANTIES—BREACH—NEGLIGENCE—EVIDENCE.

Admission in evidence in action by mink ranch against manufacturer and seller of mink food of a report, offered by the

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 5] 29 Am Jur 2d, Evidence § 251 *et seq.*
[2, 3] 29 Am Jur 2d, Evidence §§ 769, 771.
[4, 6, 7] 29 Am Jur 2d, Evidence §§ 819, 822, 827, 830.

defense, of an analysis of mink feed claimed by defendant to have come from plaintiff's mink ranch *held,* reversible error where the exhibit was not listed on the pretrial order and where defendant did not prove that the food in question came from plaintiff's ranch.

4. SALES — WARRANTIES — BREACH — NEGLIGENCE — EVIDENCE — DEFECTIVE FEED — EXPERT TESTIMONY.

Refusal to admit in evidence, at the trial of an action by a mink rancher against mink food producer and seller for furnishing defective food, expert testimony concerning vitamin A experiments conducted on chickens *held,* error where the expert stated that for the purpose of these tests there was no practical difference between chickens and mink.

OPINION CONCURRING IN PART AND DISSENTING IN PART

T. M. BURNS, J.

5. SALES — WARRANTIES — BREACH — NEGLIGENCE — EVIDENCE — DEFECTIVE FEED.

*Admission in evidence during trial of an action by a mink rancher against manufacturer and seller of defective mink feed of a report of an analysis of mink feed claimed by defendant to have come from plaintiff's ranch was proper, since there was testimony in the record from plaintiff's veterinarian that the samples in question had in fact come from plaintiff's ranch.*

6. SALES — WARRANTIES — BREACH — NEGLIGENCE — EVIDENCE — DEFECTIVE FEED — EXPERT TESTIMONY — EXPERIMENTS ON OTHER ANIMALS.

*Trial court's refusal, during trial of an action in which mink rancher sought to recover damages from suppliers who allegedly furnished defective mink feed, to permit expert testimony describing the effect which feed with a vitamin A deficiency had on chickens was proper in the absence of some proof of expert knowledge as to the effect such deficiency would have on mink or some direct connection between the chicken experiments and minks.*

7. EVIDENCE—EXPERT WITNESS—BASIS FOR OPINION—DISCRETION.

*The decision as to whether an expert witness has sufficient basis for his professed opinion is within the discretion of the trial court (GCR 1963, 605).*

Appeal from Saginaw, Fred J. Borchard, J. Submitted Division 3 March 5, 1969, at Grand Rapids. (Docket No. 4,621.) Decided August 26, 1969. Rehearing denied October 1, 1969. Application for leave to appeal filed October 17, 1969.

Complaint by Royal Mink Ranch, a Michigan corporation, against Ralston Purina Company, a Missouri corporation, and the Wickes Corporation, a Michigan corporation, for breach of warranty and negligence in furnishing defective animal feed. Counterclaim by defendants for price of the feed. Verdicts and judgments for defendants. Plaintiff appeals. Reversed and remanded.

*Fortino, Plaxton & Moskal,* for plaintiff.

*Cook, Nash, Deibel & Borrello,* for defendant Ralston Purina Company.

*Stanton, Davidson & Carl,* for defendant Wickes Corporation.

Before: Quinn, P. J., and Holbrook and T. M. Burns, JJ.

Holbrook, J. Plaintiff Royal Mink Ranch, a Michigan corporation, acting through its owner, Mrs. Josie Chaddock, brought this action for damages allegedly caused by feeding plaintiff's mink a cereal manufactured by defendant, Ralston Purina Company and distributed by defendant Wickes Corporation. The feed was claimed by plaintiff to be contaminated, nutritionally deficient, negligently prepared and improperly stored.

Mrs. Chaddock's husband, Dr. Theodore Chaddock, is a veterinarian; practicing his profession in the Saginaw area where plaintiff's mink ranch is

located. Dr. Chaddock was also concerned in the management of his wife's Royal Mink Ranch.

Plaintiff had, prior to this difficulty, purchased in preceding years the products of Ralston Purina from the Wolohan Elevator at Birch Run, known as "mink breeder chow" and "mink developer chow" both concentrates which were mixed with other ingredients to provide a total ration for feeding adult breeders and baby mink. Defendant Wickes Corporation became the owner of the former Wolohan Elevator at Birch Run and plaintiff continued to purchase the chow from defendant Wickes. Both defendants denied the claims of plaintiff and defendant Wickes filed a counterclaim against plaintiff for the purchase price of the feed.

The case was tried before the court and a jury. The verdict as to plaintiff's case was in favor of defendants of no cause of action. The verdict as to defendant Wickes' counterclaim was in favor of defendant Wickes against plaintiff for the purchase price of the feed. Judgments were filed in accordance with the verdicts. Plaintiff appeals.

There is testimony in the record that plaintiff had operated the Royal Mink Ranch since 1945 and enjoyed a high reputation as a top breeder in the country; that plaintiff continued to operate the Mink Ranch after this occurrence with some improvement, but has been unable to regain the position of prominence enjoyed before 1961.

As a part of the operation of plaintiff's mink ranch a feedhouse was maintained on the property where feeds were kept and mixed for feeding the mink. The "mink breeder chow" was advertised in various trade journals and manuals by defendant Ralston Purina as containing all the proper vitamins needed by mink during their mating and whelping period from January through June. The plaintiff

relied upon that representation of Ralston Purina and as a result purchased defendants' "mink breeder chow" and mixed it with other feed and fed the mix to the breeding mink for the 1961 season. During the whelping period when the young mink should be normally born many of the females were dying while giving birth, with most of the mink kittens being born dead as mummies or with severe malformations.

It was the theory of plaintiff on the trial of the case, that the vitamins claimed to be present in sufficient quantities in defendants' "mink breeder chow" were not actually present, especially vitamin A. Plaintiff claimed that the vitamin A, if present in the chow originally, had been destroyed by the negligence of both defendants in storing the chow too long and under improper conditions.

The plaintiff raises 3 issues on this appeal which will be considered in proper order.

1. *Did the trial court err in refusing to admit the testimony of a food ingredient man and other mink ranchers who used a prepared food containing the same "mink breeder chow" as used by plaintiff?*

Plaintiff sought to have admitted the testimony of David W. Peterson, employed in the mink food ingredient business. His testimony was taken on a separate record as provided in GCR 1963, 604; it concerned his personal observations as to conditions present at the King Ranch, another mink ranch involved in a similar lawsuit that was heard prior to the instant case, *viz.: Savage* v. *Peterson Distributing Company, Inc.* (1967), 379 Mich 197. Plaintiff claims that the testimony given by Mr. Peterson at the *Savage* trial was collateral to the circumstances in the present case and therefore admissible. In the *Savage* case the plaintiff fed his mink a ration known as Peterson's Redi-Mix, manufactured by Peterson

Distributing Company. The Redi-Mix contained Ralston Purina mink breeder chow or developer chow combined with other ingredients. In 1961, the mink on the *Savage* ranch suffered from an epidemic of food poisoning with resulting loss of mink, similar to that suffered by the Royal Mink Ranch. Examinations of both the mink carcasses and the Peterson Redi-Mix feed from the *Savage* ranch showed the presence of *salmonella* bacteria. Other mink ranchers from over a wide area testified at the *Savage* trial that they had fed the Peterson Redi-Mix to their mink and *salmonella* bacteria were found in their mink.

The trial judge ruled that the proposed testimony of Mr. Peterson pertaining to his observations at the *Savage* ranch was irrelevant to the instant case because in *Savage* a different feed mix was fed to the mink even though the defendant's products were included therein. The claims in the *Savage* case were that the presence of *salmonella* bacteria caused the loss whereas in the instant case plaintiff claims the loss was caused by a deficiency of vitamins, particularly vitamin A, in the feed. In 4 Callaghan's Michigan Pleading & Practice, § 36.207, pp 57, 58, 59 and § 36.209, pp 61, 62, it is stated:

"In general, evidence as to happenings or things not involved in the controvery, or as to conditions or facts existing at other times or places than that of the occurrence or transaction in dispute, is inadmissible on the ground of irrelevancy or immateriality. * * *

"But evidence of a fact or condition at another time or place is admissible when it appears, or where other evidence is offered to show, that such fact or condition bears upon the controversy or an issue therein, that it is connected with a fact or condition in dispute, or that it would likely be the same, or at least similar, at both times or places. * * *

"Generally, in order that evidence may be admissible as to a similar but distinct fact, the relation or similarity of which is not apparent, or in order that the admission of such evidence may not be held to be erroneous, foundation evidence is required for the purpose of showing that the seemingly extraneous fact, as to which evidence is sought to be introduced or as to which evidence has already been admitted, is connected with the controversy or an issue therein, that it is the same as, or similar to, a fact in dispute, or that the circumstances or conditions were identical, or at least similar. In other words, the fact must be connected to the case by preliminary or follow-up evidence which will satisfactorily demonstrate that evidence of the fact is competent, relevant or material."

Also see, *Crane* v. *Valley Land Co.* (1918), 203 Mich 353; *Murchie* v. *Standard Oil Company* (1959), 355 Mich 550; and *Jones* v. *New York Central Railroad Company* (1967), 8 Mich App 575.

The facts present in the *Savage* case were dissimilar to the facts in the present case, *i.e.,* the mink were not fed the same mix although a part of the mix was the same (defendants' products); the bacteriological symptoms were not the same; and the feed was not purchased from the same source. Absent a proper foundation showing a substantial similarity of conditions present at the *Savage* ranch with those at the Royal Mink Ranch, the proffered testimony of Mr. Peterson was properly ruled inadmissible as being irrelevant and immaterial. *O'Donnell* v. *Oliver Iron Mining Co.* (1933), 262 Mich 470.

Plaintiff made the following offer on the record concerning other witnesses who had used Ralston Purina feeds in feeding their mink:

"*Mr. Fortino:* May it please the court, on the matter of the ruling of the court in the *Peterson Feed,*

the court has ruled that the testimony of Mr. Peterson on his observation of the mink was inadmissible, distinguishing this because his was a complete redi-mix which was being sold and thus distinguishing it from our case.

"We had listed as possible witnesses many other people who used the Peterson Redi-mix. Pursuant to the court's ruling, I have—I do not have those witnesses here. I just simply want to state on the record that I would have tendered those witnesses except for the court's ruling and I would not tender them at this time because it is my understanding that the court's ruling covers these other witnesses."

Plaintiff's counsel did not make a specific offer of what he expected to prove by these other witnesses' testimony nor did he present them for making a segregated record and we assume in the absence of a showing to the contrary that their testimony would be inadmissible for the same reasons stated herein concerning Mr. Peterson's testimony. GCR 1963, 604; 88 CJS, Trial, § 75; p 181; *Bujalski* v. *Metzler Motor Sales Company* (1958), 353 Mich 493.

2. *Did the trial court err in admitting a report of an analysis of mink feed, exhibit 93, claimed by defendant to have come from the Royal Mink Ranch?*

Exhibit 93 was offered by defendant and admitted at trial over objections of the plaintiff. This exhibit had not been listed as an exhibit pursuant to the pretrial hearing order nor had defendant given plaintiff notice to produce the original exhibit 93 prior to trial.

GCR 1963, 301.1 provides:

"In every contested civil action the court shall direct the attorneys for the parties to appear before it for a conference to * * *

"(7) produce all proposed exhibits in the possession of the attorneys in support of the main case or

defense and admit the authenticity of such exhibits whenever possible."

The court in its pretrial order stated:

"The court would also suggest that prior to trial date that counsel get together on the list of exhibits that may be used so that they possibly can be marked if they are going to have a lot of exhibits."

Defendants urge this court to consider this order as directory or optional with the parties; however, there were a great number of exhibits and plaintiff did comply with the order. We do not deem the pretrial order on exhibits as of no force or effect. This was one of the purposes of the pretrial hearing and if it was not clear to counsel, a request for clarification would have been in order. Absent a modification of the order it should, unless cause is shown to the contrary, control the conduct of the trial. GCR 1963, 301.3; 88 CJS, Trial, § 17(2), p 44.

When exhibit 93 was offered the record discloses the following colloquy:

*"The Court.* Why were they [reports in exhibit 93] not marked at the time I ordered the exhibits to be marked? * * *

*"Mr. Deibel:* Well, your Honor please I'll take the blame for that if any blame is to be had. We felt certainly that they had these in their files and I didn't know why they didn't—hadn't been disclosed to us at this time."

It is now apparent why plaintiff's counsel did not have exhibit 93 in their possession. Dr. Chaddock took many samples of feed and carcasses of mink to Dr. Newman at Michigan State University for testing and reports. The samples for which reports were made in exhibit 93 were delivered to Dr. Newman by Dr. Chaddock, but were taken from another mink ranch and were not from the Royal Mink Ranch. Dr. Newman when receiving samples from

Dr. Chaddock did not designate the place of origin but only that Dr. Chaddock furnished them and the reports were to be made to him. Defendant may have felt that the reports in exhibit 93 were for samples taken from plaintiff's ranch but the exhibit does not disclose this fact on its face. Plaintiff would have been able to have the admissibility of this kind of exhibit ruled on before trial, had it been listed pursuant to the pretrial order.

Plaintiff also asserts that before exhibit 93 could have been properly admitted it would have been necessary to show that the reports contained therein were from samples taken from the Royal Mink Ranch. It is true that the samples were delivered by Dr. Chaddock to Dr. Newman and this fact appeared on these reports, however, the mink ranch from which the samples were obtained does not appear on the reports. Dr. Chaddock was serving as a veterinarian for many mink ranches in the area and some of them were having difficulties at the time.

The failure to connect exhibit 93 to the Royal Mink Ranch does not go to the weight and sufficiency of the evidence but rather to its admissibility. To be admissible the exhibit would have had to be properly identified and shown to relate to the subject matter of this suit by the testimony of a competent witness. 4 Callaghan's Michigan Pleading & Practice, §§ 36.187, 36.205, 36.209. *Bauer* v. *Veith* (1964); 374 Mich 1. Also, exhibit 93, being a copy, was secondary evidence. Before it could be admitted a sufficient showing was required as to why the best evidence, *i.e.*, the original, was not produced. Absent such a showing the exhibit was also inadmissible for this reason. 4 Callaghan's Michigan Pleading & Practice, §§ 36.353, 36.354.

Under the facts in this case we rule that the admission of exhibit 93 into evidence without properly

connecting it to the Royal Mink Ranch or the feed
furnished by the defendants, and the failure of the
defendants to list the exhibit pursuant to the pre-
trial hearing order, resulted in prejudice to the
plaintiff's case and is reversible error.

3. *Did the trial court err in refusing to admit tes-
timony of an expert as to vitamin A experiments
with chickens?*

Dr. J. R. Couch, the expert witness, was not per-
mitted to testify as to the specific vitamin A experi-
ments because they were made with chickens instead
of mink. Defendants asserted that to permit the
testimony concerning the vitamin A experiments
with chickens would have been an excursion into a
side issue and would have extended an already long
trial.

In reviewing the record, we find the following tes-
timony of Dr. Couch:

"*Q.* Now, have you done any work with vitamin
A, sir?

"*A.* Yes. I did my first work with vitamin A be-
tween 1931 and 1935. At that time we were using
alfalfa which contains the proper vitamin A as a
source of vitamin, and the work was done for Pro-
fessor Sherwood, and Doctor G. S. Frapp, and so
published in Texas Agricultural Experiment Station
Bulletin in this case, actually like a good graduate
student I had to do all the work, so I remember
these things quite vividly. We fed chickens on vari-
ous levels of vitamin A and when the hens received
a low level or a level that was not—would not meet
the requirements they died; egg production stopped
and the mortality went up.

"I think this is characteristic because vitamin A
is required by all animals. We also observed that
when the hens were fed in an insufficient quantity or
suboptimum level of vitamin A and we took the
chicks from these hens even though the chicks
hatched, the chicks were not strong enough."

Dr. Couch was for more than 30 years a professor of biochemistry and biophysics at Texas A & M University, and was well qualified as an expert. He did state in a separate record in the absence of the jury in referring to the tests that it made no difference whether they be conducted with chickens or mink. We conclude that to have permitted Dr. Couch to relate the details of the experiments would be admissible to explain the basis for his opinion as to the necessity of vitamin A in a stable form to be in feeds fed to animals. The present court rule, GCR 1963, 605, as we read it would permit the desired testimony proffered by plaintiff to be admitted. This ruling is made in order to aid the court on the retrial of this matter.

Reversed and remanded for new trial. Costs to plaintiff-appellant.

Quinn, P. J., concurred

T. M. Burns, J. (*dissenting in part and concurring in part*).

Although I agree with my brothers' disposition of the first issue on appeal, I cannot agree with their handling of issues numbered two and three or the resulting reversal. I would affirm.

With regard to the admissibility of exhibit 93, I am much persuaded by the defendant's brief on appeal.

"A comparison of plaintiff's exhibit 20 (five mink carcasses submitted to Dr. Newman from plaintiff's ranch) with exhibit 93 (both of which are attached to this brief) will show identical dates of submission of the mink as well as of the feed samples to Dr. Newman, as well as consecutive serial numbering of the bacteriological examination reports, indicating they were all part of the same submission and for the same purposes.

"Before interrogating Dr. Newman at trial about exhibit 93, Dr. Chaddock's memory was refreshed as to the specific dates of submission embraced by plaintiff's exhibits 20, 21, 22, 23 and 24, these being all of Dr. Newman's bacteriological examination reports on mink carcasses and various samples of mink feed submitted by plaintiff to Dr. Newman on May 31, 1961, November 16, 1961, and December 15, 1961. Dr. Chaddock was then asked the following questions and gave answers as follows:

" '*Q.* Now, those are the three dates on which you submitted either mink carcasses or cereal feed samples?

" '*A.* Or mink feed.

" '*Q.* Or the raw—some of the raw ingredients that went into your mink food, is this right?

" '*A.* True.

" '*Q.* Now, Doctor, on those dates that we mentioned did all of those various samples of either feed or animal carcasses come from your ranch?

" '*A.* They did.

" '*Q.* In other words, everything that you submitted to Dr. Newman on those dates came from your ranch?

" '*A.* That's true.

" '*Q.* The Royal Mink Ranch?

" '*A.* Yes.'

"It was only after that foundation was laid with Dr. Chaddock that Dr. Newman was interrogated as to the existence of exhibit 93 and that the same was admitted. It should be pointed out that Dr. Newman himself testified that the original reports comprising exhibit 93 would have been sent to Dr. Chaddock, that being the practice of his office, and all he had retained were his duplicate copies.

\* \* \* \* \* \* \* \* \*

" '*The Court:* Of course, this is the problem that we are always faced with when we start taking witnesses out of order because the proofs don't go in just exactly as counsel would desire them to, but what I am going to do with this exhibit, I am going

to accept exhibit 93 with the reports from the Michigan Department of Health removed from the exhibit because of certain findings that may be from the Michigan Department of Health; not findings of Doctor Newman here specifically, so with that, whatever Doctor Newman's reports are those will be received. The other part will be taken from the exhibit.

"The plaintiff through Dr. Chaddock was given full opportunity to explain that exhibit 93 did not relate to the plaintiff ranch and he took full advantage of this. He testified the feed samples in fact came from the ranch of one of his clients, one Jesse Christiansen near Midland, Michigan, which were submitted to Dr. Newman to be cultured for salmonella. Dr. Chaddock's testimony of firm denial is found in two different places.

"If the plaintiff was at all harmed by this evidence it was to the extent his credibility was challenged, and should have been challenged, in light of the foundation laid by his own deposition and answers to questions at trial. Neither defendants nor their counsel sought to take improper advantage of plaintiff or its veterinarian, Dr. Chaddock, as is charged in plaintiff's brief. Defendants respectfully submit that this minor incident out of an extended trial spanning five weeks is entirely out of proportion to the actual importance of the incident. Defendants say that the denial Dr. Chaddock gave to the relevancy of exhibit 93 was a plausible explanation of the situation of mistaken identity. It was up to the jury to decide whether this was an acceptable explanation; however, it is impossible to conceive that on the true facts of this evidentiary debate prejudicial error resulted where the issue of credibility on the part of the key witness for the plaintiff was present throughout the trial. The trial court agreed with defendants' counsel that a proper foundation had been laid for reception of exhibit 93, it was admitted for what probative value it might have, and

plaintiff was in no way foreclosed from denying its relevancy, and in fact did so. This was truly an isolated and harmless incident, such as occurs in every strenuously tried case.

\* \* \* \* \* \* \* \* \*

"Plaintiff complains that there was a failure to properly authenticate this exhibit 93, and at the end of that section of its brief the claim is made that the exhibit was only a copy of the original reports and not admissible absent a notice to produce the original. With all that is apparent from the foregoing factual summary it is impossible to understand where there was a failure properly to identify the materials being tested, as Dr. Chaddock himself in response to a cross-examination question admitted that everything sent to Dr. Newman on the given date, May 31, 1961, had come from his own ranch, and where every other indication was that the owner of the ranch was Dr. Chaddock himself. See MCLA § 600.2146 (Stat Ann 1962 Rev § 27A.2146).

\* \* \* \* \* \* \* \* \*

"Dr. Newman testified that he was the head of a bacteriological laboratory in which technicians and stenographers were employed under his supervision with respect to various testing procedures. He testified that the original report would have gone to Dr. Chaddock, that the copy would have been retained in his office and that the samples received from Dr. Chaddock were put routinely through his office in the same manner. There can be no doubt that the retained copies of reports sent out to the veterinarian, in this case Dr. Chaddock, were routine business records within the meaning of the cited statute and admissible in evidence in all trials within the meaning of that statute.

"Defendants not being obligated to give plaintiff information as to the description or contents of its exhibits and this exhibit bearing on the issues and being fully identified and authenticated, the ruling of its admissibility into evidence by the trial court

was well within the judicial discretion given by the law to the trial court in this area."

With regard to issue number 3, *i.e.,* whether the expert testimony concerning the adverse effects of lack of vitamin A on poultry should have been admitted, I must agree with the trial judge that as presented it was not admissible.

The plaintiff's expert was no doubt an expert on the adverse effects of the lack of vitamin A on chickens. However, absent some proof of some expert knowledge as to the effect on mink and some direct connection between the "chicken experiments" and minks, I must agree with the trial court.

The trial court clearly faced this issue and I believe correctly decided not to allow the testimony concerning chickens to go to the jury when he said:

"But I think we are going into a collateral matter here and if he wants to testify as to his knowledge of vitamin A, why vitamin A is needed, and so forth, I think that would be perfectly proper, but to get into testimony as to the fact that certain chickens died and effects of having it on the chicken, I think it would be collateral. I would sustain the objection in that respect."

The plaintiff's expert was allowed to testify on all aspects of his experiments with vitamin A, including his opinion that prolonged storage caused the vitamin to become inactive. The decision as to whether the "expert" had sufficient basis for his professed opinion that the effects of the lack of vitamin A on minks was the same as on chickens was within the trial court's discretion under GCR 1963, 605. I do not find that he abused that discretion. The testimony which was offered would have been highly prejudicial to defendant, and without a clearer showing of relevancy to mink, it was properly excluded.

Finding no reversible error, I would affirm.